UNITED STATES of America,
Plaintiff–Appellee,

v.

John ZAMBRANA,
Defendant–Appellant.

No. 87–1772.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 1, 1988.

Decided Dec. 15, 1988.

Joseph C. Corsino, Flossmoor, Ill., for defendant-appellant.

Michael A. Thill, Gregory A. Vega, Asst. U.S. Attys., James G. Richmond, U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before WOOD, Jr. and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This is a direct criminal appeal from a jury conviction, pursuant to a sixty-one-count indictment. The defendant-appellant, John Zambrana, challenges his convictions on one count of conspiracy to possess with intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846, one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2, and three counts of using a communication device to

facilitate a violation of the Controlled Substances Act in violation of 21 U.S.C. § 843(b). Zambrana was sentenced to five years in prison, followed by a special parole term of five years, and ordered to pay a special assessment of $250. Appellant now raises three grounds for reversal on appeal, including his assertion that the government selected only certain drug-related conversations from court-authorized interceptions of telephone calls to introduce into evidence. He also contends that it was improper for the trial court to admit wiretapped conversations into evidence because they were inaccurately translated from Spanish into English. Finally, Zambrana argues that the jury did not give sufficient weight to the testimony of co-conspirator, Andre Sanchez. We affirm the convictions.

I.

John Zambrana was charged, along with thirty-one other defendants, in a sixty-one-count indictment for their involvement in a drug trafficking operation. This was the same indictment involved in our decisions in *United States v. Zambrana*, 841 F.2d 1320 (7th Cir.1988), and *United States v. Vega*, 860 F.2d 779 (7th Cir.1988). John Zambrana's case was severed, on his own motion, from those of the other defendants named in the indictment.

Zambrana's indictment stemmed from a United States Drug Enforcement Agency ("DEA") investigation, coordinated with local law enforcement agencies, of a cocaine-distribution network in northern Indiana. As part of the investigation, a court-authorized wiretap was placed on the telephone of Jesus Zambrana, the defendant's father, at his residence in Gary, Indiana, from March to July, 1985.[1] Pursuant to the wiretap, government agents were cautioned to minimize the interception of conversations that were not within the scope of the criminal investigation. As a result of conversations heard on the wiretap, the DEA learned that the Zambranas were conducting a sophisticated drug trafficking op-

eration and were to receive a shipment of cocaine on April 25, 1985.

On the evening of April 25, 1985, the DEA, along with East Chicago and Lake County, Indiana police officers, established surveillance at various points on Interstate 65. The purpose of this surveillance was to intercept a vehicle transporting drugs from Miami, Florida to Gary, Indiana. To help in the surveillance procedure, DEA agents prepared a list of individuals suspected of being involved in the transportation of narcotics between Florida and Indiana and descriptions of their vehicles.

During this surveillance, the officers observed a 1984 rose-colored Oldsmobile Delta 88 being driven in an erratic manner. The officers followed the automobile for three or four miles and then directed the driver to pull over. Officer Downs asked the driver for his license and registration. The driver's name was Ernest Lonzo, an individual whose name appeared on the DEA's list of possible drug transfer drivers. After using Lonzo's driver's license for an identification check, Officer Downs arrested Lonzo for driving with a suspended license and took him and his passenger, Charles Cole, to the Lake County, Indiana, jail. Cole was not arrested and was released shortly thereafter.

After Lonzo's arrest, East Chicago Police Officer Fernando Villicana drove the car to the Lake County Sheriff's Garage in Crown Point, Indiana, where it was impounded. On April 26, 1988, DEA Special Agent Elaine Harris obtained a search warrant from a United States Magistrate in Hammond, Indiana authorizing a search of the automobile. During a search of the car, police officers found six packages containing a white powdery substance and approximately $960 stored in a secret compartment. The officers removed the packages from the car and took them to the DEA laboratory in Chicago, Illinois, where a chemist determined that the six packages contained 5,847.01 grams of 92% pure cocaine. The estimated street value of this cocaine was approximately $3,000,000.

---

1. Zambrana does not contest the sufficiency of the affidavits filed in support of the govern-

ment's application for the court-authorized wiretap of Jesus Zambrana's home telephone.

As part of a large family-run drug distribution organization, Zambrana was responsible for taking drug orders from customers and then relaying the messages to his brother, Jay. He also assisted his brother in the distribution of cocaine in certain instances. As in many conspiracy cases, the evidence against the defendant was largely circumstantial. The court-authorized wiretap on Jesus Zambrana's telephone produced the bulk of the evidence that the government introduced to link John Zambrana with the drug conspiracy. At Zambrana's trial, the government introduced fourteen tapes in their entirety of conversations between various members of the conspiracy. Although the word "cocaine" was never used in the telephone conversations, the government introduced testimony at trial that the co-conspirators used code words such as "the white one" or "chocolate" as substitutes for the term cocaine.

At Zambrana's trial, the government played fourteen taped conversations, spoken in a mixture of Spanish and English, in open court for the jury. As an aid to the jurors while they listened to the tapes, the trial court allowed the jurors to use English transcripts of government-prepared translations of those portions of the conversations that were in Spanish. Ava Cooper, who was qualified at trial as an expert in the translation of Spanish into English, testified that the English transcripts of the Spanish conversations were accurate.[2] The court admitted the fourteen tapes into evidence, but not the government-prepared transcripts of those tapes. Since the transcripts were not evidence, copies of them were not sent to the juryroom. The names of those persons speaking on the tapes were noted in the margin of the transcripts, but the jury was cautioned that the identification of the speakers was not evidence in the case.

On appeal, Zambrana challenges his convictions on three grounds. First, he contends that the government selected only certain drug-related conversations to introduce into evidence. Second, he claims that it was improper for the court to admit certain taped conversations into evidence because they were inaccurately translated from Spanish into English. Finally, he argues that the jury did not give enough weight to the testimony of co-conspirator, Andre Sanchez.

## II.

Zambrana asserts that the government played only certain drug-related conversations for the jury, rather than allowing the jurors to hear the entire conversations. In particular, he argues that the government failed to record the entire conversations. He also argues that the government did not make the tapes available to the defendant. We reject these contentions.

While appellant challenges the selectivity of the conversations played at trial, he made no request for additional tapes to be played. He also never objected at trial to the use of the tapes or the use of the government-prepared transcripts. The government played fourteen tapes in their entirety for the jury in open court. 3 Tr. 225. In listening to these tapes, the jury was able to hear the telephone ring at the beginning of the conversation and the parties hang up at the end of the conversation. Appellant's contention that the government selected only certain drug-related conversations to play for the jury is without merit.

Furthermore, in conducting a wiretap, the government has a statutory duty to minimize interference with telephone calls outside the scope of the criminal investigation to the greatest extent possible. 18 U.S.C. § 2518(5). Section 2518(5) protects

---

**2.** Ava Cooper, a special agent with the DEA who testified for the government at trial, was born and raised in Honduras. During that time, she learned and spoke only Spanish. She also completed one year at the University of Honduras, where all her classes were taught in Spanish. After leaving Honduras, she completed her bachelor's degree in the United States. She tes-

tified that she reads, writes, and speaks English and Spanish fluently. The trial court qualified her as an expert in the translation of Spanish into English. Based on her expert opinion, she testified that the transcripts were accurate translations of the taped conversations. 2 Tr. 118–22.

the parties' privacy by requiring the government to limit their surveillance of the parties' personal conversations.[3]

Throughout the course of the trial, government agents repeatedly testified how they complied with the statutory requirements by minimizing the interception of personal phone calls at the Zambrana residence. 1 Tr. 84, 110–11. Rather than violate appellant's rights as he contends, the government agents followed the dictates of the court-authorized wiretap in minimizing the interception of personal conversations at the Zambrana home. Zambrana correctly points out that the government introduced only drug-related conversations at the trial because that was the focus of their case against him.

Appellant also contends that the government did not make the taped conversations available to him. Both in their brief and at oral argument, the government argued that the defendant never requested copies of the tapes. We need not decide the issue of whether the defendant's demand for discovery and inspection pursuant to Federal Rule of Criminal Procedure 16 was broad enough to cover a request for the tape recordings because he has made no filing or showing that he received anything less than he requested. If his intention was to include a demand for the tapes in his discovery motion, we will assume that he received all the items that he requested.

Rather than make a filing for additional discovery or a showing that he received less than he requested, Zambrana merely made an ambiguous statement in his brief that the tapes, as to this defendant, were not provided to him. He also made no objection at trial that he failed to receive the tapes. When the tapes were introduced into evidence, the defendant raised no objection (except for relevancy), nor did he object to the playing of the tapes for the jury.

Therefore, there has been no showing whatsoever in the record that the defendant received less than he requested in discovery or that the exhibits were tampered with or modified in any way. Construing the ambiguous allegation in the defendant's brief to mean that he never received the tapes that he requested, we find nothing in the record to support this assertion. In fact, the government did supply the defendant with copies of transcripts of all the tapes that were played at trial. We find that the government complied with its obligations under the discovery rule and that there was no violation of the defendant's rights.

### III.

Appellant next argues that the English transcripts of the taped conversations were inaccurate translations. Specifically, he contends that since some portions of the tapes were unintelligible, the translations of the conversations were necessarily inaccurate.

■ "Courts possess wide discretion in determining whether to permit the jury to use written transcripts as aids in listening to tape recordings." *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985). While the defendant now challenges the accuracy of the government-prepared transcripts, he never contested their accuracy at trial. As previously mentioned, Zambrana did not even pursue his discovery request to obtain copies of the tapes so that he could produce his own translation of the conversations. Rather than challenge the accuracy of the transcripts or produce his own expert's translation of the tapes, the defendant made a deliberate, tactical decision to stipulate to the accuracy of all the government-prepared transcripts. 2 Tr. 154, 176, 187–91.

■ "Because the [defendant] had ample opportunity to either challenge specific portions of the government's transcript or to

---

**3.** 18 U.S.C. § 2518(5) in pertinent part provides: Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed ... in such a way as to minimize the interception of communica-

tions not otherwise subject to interception under this chapter....

A provision of this nature was included in the court-authorized wiretap.

prepare an alternate version," he cannot now complain on appeal when he failed to pursue these avenues at trial. *Zambrana,* 841 F.2d at 1335. In resolving a dispute in which the defendant challenges the accuracy of transcripts containing an English translation of taped Spanish conversations, we apply the Fifth Circuit's approach. *See id.* In *United States v. Llinas,* 603 F.2d 506 (5th Cir.1979), *cert. denied,* 444 U.S. 1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980), the Fifth Circuit held that " '[o]nce we have concluded that the defendants could have challenged specific portions of the Government's transcript or prepared an alternate version, it follows that they cannot be heard to complain on appeal because they failed to take advantage of their trial opportunity.' " *Id.* at 509 (quoting *United States v. Wilson,* 578 F.2d 67, 70 (5th Cir. 1978)).

■ We adopt the procedures used by the Fifth and Eleventh Circuits for resolving disputes of this kind:

"Initially, the district court and the parties should make an effort to produce an 'official' or 'stipulated' transcript, one which satisfies all sides. If such an 'official' transcript cannot be produced, then each side should produce its own version of a transcript or its own version of the disputed portions. In addition, each side may put on evidence supporting the accuracy of its version or challenging the accuracy of the other side's version."

This procedure is well suited to cases such as that before us, where the transcript is an English translation of a foreign language conversation. Such a procedure does not tie a defendant to an "official" transcript prepared by the prosecution, nor does it "usurp" the factfinder's function. If there is a dispute as to the contents of a foreign language recording the burden will lie with the respective parties to present transcripts or other evidence to support their version of the conversation.

*Id.* at 509–10 (quoting *Wilson,* 578 F.2d at 69–70); *see United States v. Cruz,* 765 F.2d 1020, 1023 (11th Cir.1985). We believe that the Fifth and Eleventh Circuits' ap-

proach to resolving challenges to the accuracy of transcripts is appropriate. In this case, the defendant had the option either to stipulate to the accuracy of the transcripts or to present his own translation to the jury. Rather than select the latter option, Zambrana chose to stipulate to the accuracy of the government-prepared translations. Since he decided to stipulate to the accuracy of the transcripts at trial, he cannot now raise this issue on appeal.

In addition, although the defendant did not produce his own expert witness to contest the accuracy of the transcripts, he did effectively cross-examine the government's witness on her ability to translate the conversations. 2 Tr. 128–32. The government's expert witness testified under oath that the "transcripts accurately reflects [sic] the conversations on the tapes." 2 Tr. 127.

■ Our own independent review of the record also convinces us that the transcripts were sufficiently clear and accurate to enable the jury to use them effectively in understanding the conversations about the ongoing criminal enterprise. A translation of a conversation from one language to another is sufficiently accurate to aid the jury if it expresses the same ideas or thoughts in different words. *See Zambrana,* 841 F.2d at 1337 & n. 13. While a translation from Spanish into English can never be exactly precise, we believe that it is unrealistic to require such exactness before allowing a jury to use a translation. *Id.* at 1337 & n. 14.

■ The defendant asserts that the transcripts were inaccurate because portions of the conversations were unintelligible. However, he never objected at trial to the fact that the tapes were so unintelligible as to be untrustworthy. In fact, "tape recordings which are only partially unintelligible are admissible unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy." *Wilson,* 578 F.2d at 69. It is up to the factfinder, here, the jury, to determine the trustworthiness of the tape recordings. *See Cruz,* 765 F.2d at 1023 & n. 4; *Wilson,* 578 F.2d at 69.

In this case, the jury had an adequate opportunity to listen to the tapes and to determine the accuracy of the transcripts in light of the testimony and cross-examination of all the witnesses, including an expert in the translation of Spanish into English. Since the defendant had an ample opportunity to cross-examine the government's expert witness and stipulated to the accuracy of all the government-prepared transcripts, we reject the defendant's claim that the transcripts inaccurately translated the conversations from Spanish into English.

## IV.

We must now address Zambrana's last claim that the jury did not give sufficient weight to co-conspirator, Andre Sanchez' testimony. Since this contention is totally without merit, we can analyze it in a very cursory fashion.

In essence, Zambrana is asking this court to substitute its assessment of the credibility of the witnesses who testified at trial for the jury's assessment. This is something that this court cannot and will not do. "It is well settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather, that question is left to the sound discretion of the trier of fact." *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

The jurors, who listened to the testimony of all the witnesses who testified at trial, were in the best position to determine how much weight to give to each witness' testimony. Although Sanchez testified that he did not have any drug dealings with the defendant, it was up to the jury, as the trier of fact, to accept or reject this testimony. If the jury found Sanchez' testimony less convincing than that of the other witnesses, this court will not step in and second guess that determination.

\* Pursuant to Circuit Rule 40(f), this opinion has been circulated among all judges of this court in regular active service. No judge favored a rehearing en banc on the question of overruling

## V.

For all of the foregoing reasons, the judgment of the district court is

AFFIRMED.